UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HEATHER CIAMBRONE,

     Applicant,

v.                                  CASE NO. 8:17-cv-2783-SDM-SPF

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

Ciambrone applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Doc. 1) and challenges her conviction for first-degree murder, for which Ciambrone is imprisoned for life.  Numerous exhibits support the response.  (Doc. 21)  The respondent admits the application's timeliness (Doc. 21 at 4) but argues that some grounds are unexhausted and procedurally defaulted.  (Doc. 21 at 6, 8, 11, 13)

## I.  **BACKGROUND**[1]

Ciambrone and her husband adopted Lucas Ciambrone, who died while under their care.  Ciambrone took Lucas, who was seven, to a hospital emergency room and told a doctor that Lucas had fallen and hurt himself.  Lucas stopped breathing but sustained a pulse and blood pressure.  The doctor tried to resuscitate Lucas, but Lucas died at the hospital.

_____

[1] This summary of the facts derives from the briefs on direct appeal (Docs. 21-10 at 436–502 and 27-1 at 2–28) and the trial transcripts.

A detective spoke with Ciambrone who described Lucas as manic-depressive, homicidal, and subject to outbursts of bad temper.  After taking a bath, Lucas became agitated because Ciambrone told him to dry himself.  Ciambrone showered in her own bathroom and returned to find Lucas slumped over in the bathtub.  Ciambrone performed CPR and drove Lucas to the hospital with her husband when he returned home from work.  Ciambrone accompanied the detective and a sheriff's deputy to her home and consented to a search.  The deputy observed that Lucas's bathroom lacked light bulbs, towels, toilet paper, and flooring.  A plastic bowl sat next to the bathtub on the concrete floor.

The next day, two detectives interviewed Ciambrone a second time at the hospital.  Ciambrone told the detectives that she home-schooled Lucas because of his violent behavior.  Lucas spent forty-five days in civil commitment after he threatened Ciambrone with a butter knife.  Lucas usually hit the walls, used obscene language, and rocked himself hard when he became agitated in the bathroom.  Ciambrone had removed the floor in the bathroom because of water damage and had removed the light bulbs because Lucas burned his little brother with a hot bulb.  Lucas ate from the plastic bucket in the bathroom.  After Ciambrone took a shower, she did not hear Lucas and found him in the bathroom with his head down.  Ciambrone provided no explanation for not calling 911.

After obtaining a search warrant, the detectives returned to Ciambrone's home for a more thorough search.  The detectives observed scratch marks on the inside of Lucas's bathroom door and bedroom door.  Both doors locked from the outside.

The detectives observed feces in the corner of the bedroom. Screws closed shut the window in the bedroom, and black paint covered the bottom of the window.

A medical examiner conducted an autopsy of Lucas and observed four areas of bleeding on his scalp consistent with non-accidental blunt force trauma, five healing fractures on his ribs, and over two hundred abrasions, lacerations, and bruises and over a hundred scars all over his body. Also, Lucas suffered from severe malnutrition. A pediatrician opined that the majority of Lucas's injuries were not self-inflicted, inflicted accidentally, or inflicted by another child. The medical examiner observed pneumonia, likely from vomit aspirated after the severe brain and other head injuries, which are normally associated with a car crash and which would have immediately incapacitated Lucas. The examiner opined that Lucas suffered battered child syndrome, that the cause of his death was non-accidental blunt force head trauma, and that the manner of death was homicide.

Neighbors and other children at the home observed Ciambrone severely punish Lucas. Ciambrone told one neighbor that Lucas defecated and urinated in the home, that she hated Lucas, that she had locked Lucas in the bathroom for a week, and that she was going to kill Lucas in one of her fits of anger. The biological daughter of Ciambrone's husband visited on the weekends and saw Lucas locked naked in the bathroom the entire day. On the day that Ciambrone took Lucas to the hospital, one of her adopted daughters saw Ciambrone place her head on her husband's chest and repeatedly say, "I'm sorry Joe, I'm sorry Joe, I'm sorry."

During the defense's case-in-chief, a radiologist opined that Lucas's distended stomach and bowels would have prevented Lucas from eating and could have caused him to vomit his food.  The radiologist observed bacteria and fluid in Lucas's lungs but no blood on Lucas's brain.

A neighbor saw Lucas violently strike his head against hard objects, including a concrete floor, a door, and an oak tree.  Once, Lucas grabbed his own ears and tried to tear them from his head.  Another neighbor saw Ciambrone with a severely bruised knee-cap and bitemarks and bruises on her legs.

A psychiatrist who treated Lucas, when Lucas was civilly committed as a four-year-old, testified that Lucas had suffered from stomach parasites likely caused by consuming water contaminated with fecal matter.  The psychiatrist observed Lucas throw toys, hit hospital staff, attack other patients, and display mood swings, impulsiveness, hyperactivity, and anger.  Lucas regularly bit himself and spoke disparagingly about his foster mother.  When placed in a quiet room to restore his calm, Lucas usually yelled, screamed, and banged the door with his shoulder.

A clinical social worker who worked with Lucas during his civil commitment testified that Lucas acted very aggressively, lacked any understanding of boundaries, and refused to follow directions.  Lucas regularly threw himself on the floor, ran into walls, banged his head on walls, and picked at himself.  Lucas sometimes refused to eat and other times drank from the toilet and ate feces.  Also, Lucas threatened to hurt and kill himself and other people.  The social worker diagnosed Lucas with attachment disorder, oppositional defiant behavior, and post-traumatic stress

disorder and opined that Lucas posed a severe danger to himself and others.  The social worker suggested to Ciambrone that she both prevent Lucas from accessing knives and other weapons and lock him in his bedroom at night.

A clinical psychiatrist testified that a child who was abused or neglected during the first two years of his life can suffer from "reactive attachment disorder." The child can hurt animals, other children, and his parents without remorse and can engage in self-destructive behavior, such as banging his head against a wall.  Also, the child can lack control over eating and might hoard or gorge on food.  According to the psychiatrist, a parent must lock the child in his bedroom at night to prevent the child from bothering other children or leaving the home, and the parent of the child might feel hopeless, might feel rage toward the child, and might experience an impulse to abuse the child to control the child's behavior.

## II.  EXHAUSTION AND PROCEDURAL DEFAULT

The respondent argues that grounds one, two, three, and four are procedurally barred from federal review because Ciambrone failed to exhaust the claims.  (Doc. 21 at 8–10, 11, 12, 13)  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal

nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citing *Henry*, 513 U.S. at 365–66).

## Ground One:

Ciambrone asserts that the trial court violated her federal right to due process by admitting into evidence at trial inflammatory photographs of Lucas. (Doc. 1 at 4–5) Ciambrone presented a similar claim as her first issue on direct appeal but presented that issue under state law — not as the violation of a federally protected right. (Doc. 21-10 at 483–85) The failure to alert the state appellate court of the claim that the trial court violated a federally protected right fails to meet the exhaustion requirement. *Henry*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). Ground one is unexhausted.

## Ground Two:

Ciambrone asserts that the trial court violated her federal right to due process by admitting into evidence at trial irrelevant and prejudicial character evidence. (Doc. 1 at 5–6) Ciambrone presented a similar claim as her second issue on direct appeal but presented that issue under state law — not as the violation of a federally protected right. (Doc. 21-10 at 485–89) The failure to alert the state appellate court of the claim that the trial court violated a federally protected right fails to meet the exhaustion requirement. *Henry*, 513 U.S. at 366. Ground two is unexhausted.

**Ground Three:**

Ciambrone asserts that the trial court violated her federal right to present a defense by excluding from evidence at trial a videotaped interview of Lucas's sister by a member of the child protection team several days after Lucas's death. (Doc. 1 at 7–8) Ciambrone presented a similar claim as her third issue on direct appeal and cited the Sixth Amendment and Fourteenth Amendment of the federal constitution. (Doc. 21-10 at 491) Because Ciambrone cited federal constitutional law in support of her claim, she alerted the state court to the federal nature of her claim. *Reese*, 541 U.S. at 32 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"). Ground three is entitled to a review on the merits.

**Ground Four:**

Ciambrone asserts that the state court violated her federal right to due process by excluding from evidence at trial professional misconduct by the medical examiner who conducted the autopsy of Lucas. (Doc. 1 at 9–10) Ciambrone presented a similar claim as her fourth issue on direct appeal and cited the Sixth Amendment and Fourteenth Amendment of the federal constitution. (Doc. 21-10 at 494) Because Ciambrone cited federal constitutional law in support of her claim, she alerted the state court to the federal nature of her claim. *Reese*, 541 U.S. at 32. Ground four is entitled to a review on the merits.

Ciambrone could have raised the claims in ground one and ground two on direct appeal and is barred from doing so collaterally in a Rule 3.850 motion. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence.").  Because Ciambrone cannot raise the claims in ground one and ground two in state court, the grounds are procedurally defaulted in federal court.  *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.").

Ground one and ground two are barred from federal review absent a showing of "actual cause and prejudice" or a "fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Ciambrone proffers no specific facts to establish either.  (Doc. 36 at 10–12) Consequently, ground one and ground two are procedurally barred from federal review.

## III.  <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding.  *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192.  A respondent may contest "the presumption by showing that the

unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court affirmed Ciambrone's conviction and sentence.  (Doc. 21-10 at 504)  Similarly, in another *per curiam* decision without a written opinion the state appellate court affirmed the denial of Ciambrone's Rule 3.850 motion for post-conviction relief. (Doc. 21-17 at 36)  A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1).  *Wright v. Sec'y Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002).  *Richter*, 562 U.S. at 100 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Ciambrone bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The

presumption applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001). Ciambrone's federal application presents the same grounds that she presented to the state court. The state court's rejection of Ciambrone's claims warrants deference in this federal action. (Docs. 21-7 at 261–70, 21-9 at 261–63, 21-15 at 144–57)

## IV. <u>ISSUES ON DIRECT APPEAL</u>

### <u>Ground Three:</u>

Ciambrone asserts that the trial court violated her federal right to present a defense by excluding from evidence at trial a videotaped interview of Lucas's sister by a member of the child protection team several days after Lucas's death. (Doc. 1 at 7–8) Lucas's sister was eight during the interview but twenty when she testified at trial. (Doc. 1 at 8) Ciambrone contends that inconsistent statements on the video would have impeached testimony by Lucas's sister at trial. (Doc. 1 at 7–8) She further contends that observing on the video the demeanor of Lucas's sister would have assisted the jury in evaluating her credibility. (Doc. 1 at 7–8) The trial court excluded the videotaped interview (Doc. 21-9 at 261–63):

| | |
|---|---|
| [Trial counsel:] | The only other thing that we want to do is play the tape, but now — part of my thinking is I don't know when she's leaving and I don't know, [co-counsel] is talking about playing it during his case-in-chief, and I don't want her to leave and not be able to verify what it is. Is she going to be around? |
| [Prosecutor:] | Why are you playing it, for what purpose? She's admitted everything you asked her, including — |

[Trial counsel:]      Well, I think —

[Prosecutor:]      You can't — no, no, let me just make my, put it on the record. That was impeachment. Once you explain, deny[,] or admit, once you admit, you're done.

[Trial counsel:]      I think her demeanor on it is also evidence, and I think the jury is allowed to see what this little girl acted like. She's saying she's terrified, she's saying she did it because she was afraid of them, and I think her demeanor on the tape is also evidence and they are allowed to see that, it is absolutely evidence.

[Court:]      I don't think so. I mean, in terms of keeping her here for that purpose.

[Trial counsel:]      Well, that's my question, if we're not going to keep her here for that purpose, then I will go ahead and play it with her now. The question is just simply, you know, her demeanor on the tape is just as much a part of her words as the words themselves. I mean, I don't understand how you cannot — their argument is that she was terrified during the exam and that's why she was making this up. I mean, if it were a child interview for them, there would be no question that you would see the tape to see the demeanor of the child.

[Prosecutor:]      Judge, we never argued that she was terrified on the tape. She said she was afraid, that's why she gave those answers. I never said she was terrified on the tape; I never characterized her as being fearful on the tape. She was impeached. She agreed with everything.

[Court:]      She was impeached. I think that's sufficient. Anything else would be cumulative on it or bolstering.

During the defense's case-in-chief, the trial court denied the defense's motion to introduce the videotape into evidence as follows (Doc. 21-10 at 45–46):

[Trial counsel A.T.:] Your Honor, when the witness Brenda Patton testified, Ms. Fury advised the Court that we [ ] had marked as —

[Trial counsel J.F.:] Preston. Brenda Preston.

[Trial counsel A.T.:] Excuse me, Brenda Preston. We [ ] had marked as Defendant's Exhibit 2 Ms. Preston's videotaped statement that was made to the Child Protection Team member Mary Marable, the statement having been made on May 15, 1992.

[Prosecutor J.Q.:] '95.

[Trial counsel A.T.:] I'm sorry. The brain's not working so good this morning. 1995. And it would be our intention [in] the defense case to offer that as a piece of evidence to be considered by the jury.

Now, I think by agreement of the parties, there was not an issue with respect to the foundation, *i.e.*, that that was in fact Brenda on the tape. I think what the issue was[,] was whether the Court was going to allow that to be played or whether there was an objection from the State Attorney to the playing of that tape.

It's our position that the tape would help show a number of things. It would help demonstrate her age at the time that the statement was made. It would help illustrate the leading nature of the questions that she was asked. It would help show that she did not make the statements that she offered to the jury in trial, she did not make most of those during the course of the videotape.

And it would show that whenever she did make any statements about Heather

- 14 -

Ciambrone, that they were at the repeated prompting of the interviewer. It would show that she says on the tape that she was repeatedly instructed by her mother to tell the truth during that tape. It would show that she is not fearful or apparently not fearful as she is answering the questions.

And we believe also that it can be used as impeachment because she did not distinctly admit to every inconsistent statement that Ms. Fury asked her about on cross-examination. She did admit to many of the inconsistent statements, but did not admit or remember all of them. So for these reasons, we would be offering that tape during the defense case.

[Prosecutor J.Q.:]   Judge, we objected before and the Court sustained the objection in light of the fact that she was successfully impeached. And unlike Lucas Ciambrone, she was not listed as a victim in this case. She's a witness. She answered every question that I can recall posed by Ms. Fury that, yes, I said that then.

I recall every statement she said because I had shown her the videotape and she acknowledged that on the stand. And I asked her that. I said: ["]Did you see that tape? Did you say those things on that tape?["]

That's the purpose for impeachment, to get her to say that. And she did acknowledge that she said everything. And I think she acknowledged that her age was eight at the time the tape was made. And Judge, I don't think there's any purpose in playing this tape since she's been impeached other than to give them another chance to impeach her once again without her presence here. And I believe the original objection was the correct one, which you sustained.

> [Court:]                    Anything else, Mr. Tebrugge?
>
> [Trial counsel A.T.:] No, ma'am.
>
> [Court:]                    At this time, the Court sustains the State's
>                             objection as to the videotape of Brenda.

Whether the videotaped interview was admissible to impeach Lucas's sister is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985). During the interview, Lucas's sister exculpated Ciambrone by (1) denying that Ciambrone physically punished Lucas other than by spanking, (2) denying that she observed anyone hurt Lucas, (3) confirming that Lucas would fall and pretend that he was injured, (4) confirming that Lucas pulled his own ears, (5) confirming that Lucas would become injured while physically fighting with other people, (6) confirming that Ciambrone allowed Lucas to play outside, and (7) confirming that Ciambrone told her to tell the interviewer the truth. (Doc. 21-9 at 239–44) On cross-examination at trial, trial counsel asked Lucas's sister whether she made those statements during the interview. (Doc. 21-9 at 241, 244) Lucas's sister agreed that she made the statements but explained that she "mostly" lied during the interview because she feared returning to Ciambrone's home. (Doc. 21-9 at 244)[2]

---

[2] Lucas's sister did not remember two of the more-than-twenty statements from the interview that trial counsel identified on cross-examination. Lucas's sister remembered telling the interviewer that Lucas ate in the bathroom but did not remember saying that Lucas ate in the bathroom because he stole food. (Doc. 21-9 at 241) Also, Lucas's sister remembered telling the interviewer that other people punched Lucas when Lucas punched them but did not remember saying that Lucas "would bang [Ciambrone] around." (Doc. 21-9 at 244) Her failure to remember the two statements would not have justified admission of the entire videotaped statement.

Because Lucas's sister admitted to exculpating Ciambrone during the interview, the defense could not introduce into evidence the videotaped interview to impeach Lucas's sister.  § 90.614(2), Fla. Stat. ("If a witness denies making or does not distinctly admit making the prior inconsistent statement, extrinsic evidence of such statement is admissible.").  *Jennings v. State*, 512 So. 2d 169, 172 (Fla. 1987) ("Defense counsel sought to attack Muszynski's credibility by showing that he had alleged in his own sworn pretrial motions that he was insane. Muszynski acknowledged having made the motions and admitted to lying therein. . . . The motions could not be introduced for purposes of impeachment because Muszynski admitted that he had made the prior inconsistent statements.").

Ciambrone cites no clearly established federal law that the state court either ruled contrary to or unreasonably applied.  28 U.S.C. § 2254(d)(1).  "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense but [the U.S. Supreme Court] [has] also recognized that state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citations and internal quotations omitted).  "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citation omitted).

The rule that excluded the videotaped interview of Lucas's sister is neither "arbitrary" nor "disproportionate to the purposes [it] [is] designed to serve."  *Scheffer*,

523 U.S. at 308. *Wingate v. New Deal Cab Co.*, 217 So. 2d 612, 614 (Fla. 1st DCA

1969) explains:

> The reason underlying a party's right to counteract a witness's
> trial testimony as to a material fact with the introduction in
> evidence of a prior inconsistent statement is well stated in
> McCormick on Evidence, page 63, in the following fashion:
>
>> When a witness has testified to facts material in
>> the case, it is provable by way of impeachment
>> that he has previously made statements relating
>> to these same facts which are inconsistent with
>> his present testimony. The making of these
>> previous statements may be drawn out in
>> cross-examination of the witness himself, or if on
>> such cross-examination the witness has denied
>> making the statement, or has failed to remember
>> it, the making of the statement may be proved by
>> another witness.
>
> The theory of attack by prior inconsistent statements is not
> based on the assumption that the present testimony is false and
> the former statement true but rather upon the notion that
> talking one way on the stand and another way previously is
> blowing hot and cold and raises a doubt as to the truthfulness of
> both statements.

A federal court applies the same rule. *BankAtlantic v. Blythe Eastman Paine*

*Webber, Inc.*, 955 F.2d 1467, 1476 (11th Cir. 1992) ("When a witness admits making

a prior inconsistent statement, extrinsic proof of the statement is excludable.").

*Accord United States v. Roger*, 465 F.2d 996, 997 (5th Cir. 1972) ("Roger also objects to

the district court's refusal to admit an earlier tape-recorded statement, in which Cole

exculpated him, for the purpose of impeaching Cole's testimony. Cole had, however,

freely admitted making the statement both on direct and cross-examination, but said

that he had made it because of threats from Roger. Admission of the statement

would have served no purpose, since it would not have contradicted Cole's testimony.").

Because the defense thoroughly impeached Lucas's sister (Doc. 21-9 at 244–61) and argued in closing that the inconsistent statements proved that Lucas's sister was an unreliable witness (Doc. 21-10 at 350–51), exclusion of the videotaped statement infringes no "weighty interest of the accused." *Scheffer*, 523 U.S. at 308. Ground Three is denied.

**Ground Four:**

Ciambrone asserts that the state court violated her federal right to due process by excluding from evidence at trial evidence of professional misconduct in other cases by the medical examiner who performed the autopsy of Lucas. (Doc. 1 at 9–10) She contends that a complaint alleged that the medical examiner engaged in deceptive and fraudulent conduct during her practice of medicine. (Doc. 1 at 9) Because of the accusations, the medical examiner's office re-examined several autopsies, which resulted in dismissal of criminal cases. (Doc. 1 at 9) The medical examiner voluntarily resigned from the practice of medicine, and a successor medical examiner testified at trial based on the report by the medical examiner who resigned. (Doc. 1 at 9)

The trial court excluded evidence of the professional misconduct as follows (Doc. 21-7 at 262–70):

> [Prosecutor J.Q.:]   . . . But there's a couple new issues.
> Number one was the motion previously
> granted regarding the sentence. Number

two was also the motion regarding the incarceration.

Number three is a new motion, Judge, which involves any mention of extrinsic evidence pertaining to the facts or circumstances surrounding or prompting Doctor Joan Wood's departure from the Pinellas [and] Pasco County Medical Examiner's Office. She was the doctor that did the autopsy on Lucas Ciambrone back in 1995. She left the medical examiner's office last year and she is medically unavailable for testimony. Doctor Mary Case from Saint Louis, Missouri, is now going to testify regarding the autopsy and the fact that Doctor Wood has left that office.

The circumstances of why she left the office would not be relevant to this proceeding. And also under 90.403, it might necessarily involve evidence which could mislead the jury regarding the true issue of the case. It would be unfairly prejudicial to the State, as well, to bring out reasons why she departed. This was some five years after she conducted the autopsy of Lucas Ciambrone. So any evidence regarding her medical condition today, since she's not testifying, would not be germane to these proceedings and we'd ask that be noted.

[Prosecutor B.L.:]   That hooks into the other motion that I filed on Doctor Wood.

[Prosecutor J.Q.:]   I don't know if you want to address that later, Judge, with that other motion.

[Court:]   We might as well talk about —

[Trial counsel J.F.:]   It is part of [the prosecution's] motion to have a specific instruction as to Doctor Wood and what —

[Court:]                Let's argue it all at once, then, I think. Go ahead.

[Prosecutor B.L.:]     My motion, motion *in limine* regarding Doctor Wood, Judge, I'm just asking the Court to give us some indication. I've pretty much laid out what we — the only thing we would intend to do is, we're not calling her. [Trial counsel] knows the background and in fact even has her updated address that Judge Adams ordered me to give. She's still there.

So we're not calling her, but we just intend to introduce through Larry Bedor that she's no longer working with the Medical Examiner's Office. That would be the extent of it.

And as I put in subsection four, that any other questions concerning either the circumstances surrounding Doctor Wood's retirement or her current medical condition or location are not relevant to the issues of this case. And just as importantly, then, under *State versus Michaels*, we would ask that since she's equally available to both sides, that neither side be able to comment on, ["]Why didn't they call Doctor Wood?["] She's not the mother or somebody that's close to either side.

So I'm just trying to get some guidance from Your Honor that if we — how far can we go. In other words, if we mention that, are we opening up the door to everything else? I can tell you that it's a long story that evolves from the fact why she's not there. It involves another case up there. It involves her retirement, and now she's in a facility.

[Court:]                Ms. Fury.

[Trial counsel J.F.:]   Well, Your Honor, obviously since the State is going to call Doctor Case and

Doctor Case's opinion is based upon all the information we received from Doctor Wood, obviously Doctor Wood's credibility, her bias, all of those come into issue. So those are things that we have to be able to discuss and to explore.

Now, while I agree with the State that whatever her current medical condition is, if it is not in fact related to anything or that we can't link it up to five years ago, then it would not be admissible.

| | |
|---|---|
| [Court:] | Do you know whether it is linked up? |
| [Trial counsel J.F.:] | And that's what I would say. I mean, for example, say she had Alzheimer's disease and that's why she's where she is. If we could in fact show — |
| [Court:] | Do you know that? |
| [Trial counsel J.F.:] | I don't know that. I don't know that. |
| [Court:] | So you don't have a good faith basis even to bring it up. |
| [Trial counsel J.F.:] | But I will say that we do have a good faith basis that there were other cases that occurred back at a time that this one occurred that Doctor Wood was also involved in that shows her bias, that would go to her credibility. And while, you know, perhaps we could agree that if there is no link between current instances of bias or lack of credibility — and I'm not conceding that point — if we could show that any current instances of bias or lack of credibility would also go back to that time and any events that occurred back then that go to her bias or credibility, that those would be issues that we would necessarily be able to, of course within the Court's — the Court has some discretion as to and can conduct some sort of *in camera* review as to what that evidence is to make sure that it does in fact in some |

way relate; that it is not off-the-wall and completely unrelated. But once that is done, if we can make that showing that it is in some way related to her credibility, to her bias, that that information should be able to go to the jury. And we do in fact have at least one or two other cases from the time that she was involved in Heather Ciambrone's case that shows a bias, shows a problem with credibility and reliability of Doctor Joan Wood, and we should be able to discuss those.

[Court:]          Well, is Doctor Wood's opinion going to be offered to the jury?

[Trial counsel J.F.:]   Doctor Wood's opinion will not be offered. But what we do have is that her information, her — what she did, how she conducted that autopsy, if she left anything out, if she included things — any of those things that may be unreliable, those went to Doctor Case for her to form her opinion. She is going to be — in essence, that is going to be hearsay testimony by Doctor Wood coming in at trial through Doctor Case because it's the basis of her opinion, and all of that information that Doctor Wood provided to her through the State.

And so under the rules of evidence, she would be — Doctor Wood would be just as eligible or liable to I guess issues of credibility, issues of bias. We would be able to introduce evidence on that because she is in essence a hearsay declarant. Her reports, her notes, what she did, how she did it, those things went to Doctor Case and that is how Doctor Case came up with her opinion.

It would be —

[Court:]          Have you deposed Doctor Case?

[Trial counsel J.F.:]   Yes. Mr. Slater has deposed Doctor Case.

| | |
|---|---|
| [Court:] | Did you go into all this with Doctor Case? |
| [Trial counsel J.F.:] | I'm not sure. Did you? |
| [Trial counsel J.S.:] | What? Regarding Doctor Wood? |
| [Court:] | What she's talking about right now. |
| [Trial counsel J.S.:] | No. As far as her medical — no, we did not. I don't think she even knows, Judge. |
| [Court:] | Ms. Fury, anything else? |
| [Trial counsel J.F.:] | As to the motion for a special jury instruction, the State is basically asking that, you know, we sanitize this; that we — |
| [Court:] | Which one are you talking about? |
| [Trial counsel J.F.:] | I'm talking about *State versus Michaels*, that case where he's asking that we not be allowed to mention the fact that Doctor Wood is not here to testify. And you know, the State makes the argument that we all have equal access to Doctor Wood, but we don't. |
| [Court:] | Why not? |
| [Trial counsel J.F.:] | The State has better access. They have a report that they have been able — you know, her autopsy reports, all of that information that they have been able to give to Doctor Case, and that's going to come in as far as the State wants it to be; completely sanitized, unimpeachable, unable for us to — |
| [Court:] | Doctor Wood is unavailable as a witness; is that what you're saying? |
| [Trial counsel J.F.:] | We can't bring her here. She's in the hospital. And so we don't have access to cross-examine her. |

| | |
|---|---|
| [Court:] | You can't depose her? |
| [Trial counsel J.F.:] | I believe she was deposed back in '96 or '97. |
| [Trial counsel J.S.:] | We tried to do that, Judge. She's not answering subpoenas for deposition. |
| [Trial counsel J.F.:] | And so at this point, we don't have the same access to her and we should be able to in some way let the jury know that Doctor Wood is not here. The issue as to why she's not here, I agree with the State; if she's currently having, you know, medical problems, whatever she's having, you know, that those we could not be able to discuss. But as far as she's not here, she's not here to testify, Doctor Case is and that Doctor Case's testimony is based purely upon Doctor Wood's reports, *et cetera*, those sorts of things. And we ought to be able as a hearsay declarant, which is what Doctor Joan Wood would be, we ought to be able to impeach her credibility and address her bias. |
| | And so those are all things that we have to be able to discuss during trial and we ought to be able to address during closing. |
| [Court:] | Mr. Lee? |
| [Prosecutor B.L.:] | I'm not suggesting they do this, but I mean, she is equally available to both sides. I gave the address to Mr. Slater awhile back, where she is up in Clearwater. So the bottom line is, she's still equally available to both sides. It's just, apparently, both sides choose not to call her as a witness. |
| | They haven't attempted to bring her in here. I don't know what would happen as a result of that. I know that I am not calling her as a witness. *Michaels* stands for the proposition, if the person is equally available — that's all I'm asking for in |

that instruction, just that they can't comment on it.

In regards to trying to impeach her, she won't be testifying in this case. And the case law that we have, which is *Brennan versus State*, 754 So. 2d 1, Florida Supreme Court in 1999, says that another medical examiner can review the autopsy, the pictures. It's a public record after all that's filed under statute. But they must then come up with their own opinion based upon their review of the materials.

So now I guess they're going to — trying to attempt to impeach Doctor Wood, and I don't know with what. I haven't seen any of this information yet. Even though she's not testifying, because of some prior cases her report in this case is I guess unreliable. I guess that's what they're saying. A lot of the report deals with just photographs and slides. Some of the findings in the report, she lays out the injuries, obviously. But Doctor Case is making her own evaluation and her own opinion in this case.

And I don't know exactly what those other cases deal with. I can tell you, the last case that she was involved in before her retirement had nothing to do with child abuse. It had to do with dehydration of an older child. And then in fact, Doctor Wood I think actually changed her opinion in that case. I mean, it shows that she was flexible and changed her opinion. So if that's the case they're talking about, clearly that wouldn't establish any bias and she was willing in fact to, when she reviewed other materials, to come off her opinion. I know that for a fact.

But as far as what other evidence they're trying to get in, I clearly would like to know what it is or a proffer be made

|  | beforehand, especially when she's not even testifying. |
|---|---|
| [Court:] | As to State's motion *in limine* filed December last year, paragraph three is granted. |
|  | As to the motion *in limine* directed toward Doctor Wood, that's granted; and specifically under *State versus Michaels* prohibiting anybody from commenting on the failure of the State to call Doctor Wood as a witness. |

The state criminal case transferred to a new judge, and the successor judge adopted the predecessor judge's ruling.  (Doc. 21-8 at 98–100)

Whether impeachment evidence of Dr. Wood who conducted the autopsy of Lucas but did not testify at trial was admissible is an issue of state law, and a state court's determination of state law receives deference in federal court.  *Machin*, 758 F.2d at 1433.  At trial, the defense proffered the following testimony by Dr. Nelson in support of the admission of evidence impeaching Dr. Wood (Doc. 21-9 at 505–08):

| [Trial counsel:] | Dr. Nelson, in addition to the duties that you described, you're also the head of the Florida Medical Examiner Commission; is that right? |
|---|---|
| [Dr. Nelson:] | Chairman. |
| [Trial counsel:] | How long have you held that position, sir? |
| [Dr. Nelson:] | Since right about 2000, I believe. |
| [Trial counsel:] | Okay. Now, as chairman of the Florida Medical Examiner Commission, are you responsible for keeping other medical examiners in line, discipline — |

[Dr. Nelson:]          Yes, it's a regulatory and oversight board for the medical examiners of the State and how the State conducts medical legal death investigation.

[Trial counsel:]        Okay. Now, the medical examiner in this particular case was Dr. Joan Wood. Are you familiar with the circumstances surrounding Dr. Wood's departure from District Six?

[Dr. Nelson:]          Just in general terms.

[Trial counsel:]        Okay, what are you familiar with?

[Dr. Nelson:]          That she was not reappointed by the governor. The gubernatorial appointment, most of the medical examiners in the state, myself included, are appointed by the governor, it's the governor's prerogative whether or not he wishes to reappoint us.

[Trial counsel:]        Okay, do you know Dr. Jon Thogmartin, who is her successor there?

[Dr. Nelson:]          Yes.

[Trial counsel:]        Were you aware that Dr. Jon Thogmartin reopened a number of Dr. Wood's cases after he became medical examiner?

[Dr. Nelson:]          Yes.

[Trial counsel:]         And why did he do that?

[Dr. Nelson:]          It's my understanding, because I was involved in two of them, it was based on a request from the State Attorney, Bernie McCabe, and the two cases that I was involved with, it was Mr. McCabe that requested my involvement.

[Trial counsel:]        Was that because of concerns about Dr. Wood's work that she had done on those cases?

| | |
|---|---|
| [Dr. Nelson:] | I think that would probably be a fair statement. |
| [Trial counsel:] | Okay. Were you aware that Dr. Wood, and I don't know if prosecuted is the right term, that a complaint was filed against her with the Division of Medicine concerning her medical license? |
| [Dr. Nelson:] | I believe that's what's present on the Board's website, yes; that's all public record material. |
| [Trial counsel:] | And that as a result of that, she voluntarily relinquished her medical license? |
| [Dr. Nelson:] | Yes. |
| [Trial counsel:] | Okay. And as you pointed out — let me show you what's been marked as Defendant's Exhibit 3, and ask if that is what is available as public record. |
| [Dr. Nelson:] | Yeah, this is available on the Board of Medicine's website, their final order and their administrative action, yes. |
| [Trial counsel:] | Judge, that would conclude the proffer. It would be my desire to present that testimony to the jury and to admit Defendant's Exhibit — is it 3? |
| [Court:] | Three. |
| [Prosecutor:] | Hearsay, and I believe — let me just ask a question. |
| | . . . |
| | The two cases that you were reviewing, were those a couple of years after this particular case, autopsy? |
| [Dr. Nelson:] | Yes. |
| [Prosecutor:] | 1998, I believe? |

- 29 -

| | |
|---|---|
| [Dr. Nelson:] | 1998, yes. |
| [Prosecutor:] | And in fact, one of the cases Dr. Wood didn't even perform the autopsy? |
| [Dr. Nelson:] | That's correct, one of the cases was an associate of hers, Marie Hanson. |
| [Trial counsel:] | You know, Judge, my position is that if Dr. Wood were here testifying, I would certainly be allowed to question her about these materials. And with Dr. Nelson having to rely so wholeheartedly upon her report before the jury, that I should be allowed to ask these questions to get that information in front of the jury. |
| [Court:] | Okay. Mr. Lee? |
| [Prosecutor:] | The information that's in that report is all hearsay evidence. |
| [Court:] | Okay. |
| [Prosecutor:] | Besides my other objection, I don't think it's relevant, it's a couple of years afterwards, and there's nothing to indicate in this particular case, at least I haven't heard, that there's anything wrong with her findings in this case. |
| [Court:] | Okay. Your motion, I guess, to include this is denied. |

At trial, Dr. Nelson testified that he reviewed hospital records, a letter from the child protection team, typewritten notes by Dr. Wood, Dr. Wood's autopsy report, photographs of the autopsy, and glass slides of Lucas's brain. (Doc. 21-9 at 404–05) The doctor reviewed the photographs with the jury and identified four separate injuries on Lucas's brain and other injuries and scars on his body depicted in the photographs. (Doc. 21-9 at 408–30) The doctor reviewed the brain slides

under a microscope and testified that staining on the slides showed that Lucas

suffered severe brain injury, which is normally associated with a car crash and which

would have immediately incapacitated Lucas.  (Doc. 21-9 at 436–441)  The doctor

formed his own opinion based on his review of all materials, including Dr. Wood's

report, that the cause of Lucas's death was blunt force head trauma and that the

manner of death was homicide.  (Doc. 21-9 at 443, 492)

Dr. Nelson relied on other objective factual findings in Dr. Wood's report

including that Lucas's body lacked subcutaneous fat, that Lucas suffered five

fractures to his ribs and a total of 203 separate injuries and 113 scars, that Lucas's

lungs appeared discolored, and that each lung weighed twice the average weight of

a lung of a similarly aged child.  (Doc. 21-9 at 406, 423, 433–34)  The doctor drew

his own conclusions from these objective factual findings that at the time of death

Lucas suffered from malnourishment, battered child syndrome, and pneumonia.

(Doc. 21-9 at 406, 434, 443)

On cross-examination, trial counsel confronted Dr. Nelson with his failure to

personally attend Lucas's autopsy and the doctor responded as follows (Doc. 21-9

at 484–85):

| [Trial counsel:] | Just have one final area I'd like to talk with you about, Dr. Nelson, and that's some of the challenges that you faced in this particular case, okay? I think you told the jury that the word "autopsy" means to see with your own eyes, right? |
|---|---|
| [Dr. Nelson:] | Yes. |

| [Trial counsel:] | But that's not what happened in this case, right? |
|---|---|
| [Dr. Nelson:] | Well, it's what happened in this case for Dr. Wood to make her report, yes. |
| . . . | |
| [Trial counsel:] | It's not usual for you to be relying upon the work of another forensic pathologist, right? |
| [Dr. Nelson:] | Well, it's not that uncommon at all. I've had a physician in my office that retired about three years ago. His cases are now coming to trial. I'm the one that goes to trial on those cases, because the medical examiner's report, the autopsy report is kept in the usual course of business for that reason, that anybody ought to be able to pick it up, read that report, and go to court and testify to the objective findings present in that report by the medical examiner that authored the report, and that's what happened here. |

Because Dr. Nelson derived his own independent opinion from his review of medical records, photographs, notes, the autopsy report, and the glass slides, testified at trial about that opinion, and faced cross-examination concerning that opinion, Dr. Nelson's opinion was admissible. *Calloway v. State*, 210 So. 3d 1160, 1194–95 (Fla. 2017); *Capehart v. State*, 583 So. 2d 1009, 1012–13 (Fla. 1991) (citing § 90.704, Fla. Stat.). Because the defense sought to impeach Dr. Wood concerning cases and alleged misconduct about which Dr. Nelson had no knowledge and which were unrelated to the autopsy of Lucas in this case, the state court did not unreasonably exclude that impeachment evidence. *Roosevelt v. State*, 42 So. 3d 293, 295–95 (Fla. 3d DCA 2010) ("'Cruse was attempting to introduce evidence of an arguably inadequate

evaluation by an expert over ten years before he ever conducted an evaluation in this case. . . . If such inquiry were permissible, every trial involving expert testimony could quickly turn into a battle over the merits of prior opinions by those experts in previous cases, malpractice suits filed against them, and Department of Professional Regulation allegations.'") (quoting *Cruse v. State*, 588 So. 2d 983, 988 (Fla. 1991)).

Ciambrone cites no clearly established federal law that the state court either ruled contrary to or unreasonably applied.  28 U.S.C. § 2254(d)(1).  "[F]ederal courts will not generally review state trial courts' evidentiary determinations."  *Taylor v. Sec'y, Fla. Dep't Corrs.*, 760 F.3d 1284, 1295 (11th Cir. 2014).  "Habeas relief is warranted only when the error 'so infused the trial with unfairness as to deny due process of law.'"  *Taylor*, 760 F.3d at 1295 (quoting *Lisenba v. People of State of Cal.*, 314 U.S. 219, 228 (1941)).  *Accord Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984) ("[W]here a trial court's evidence ruling renders a state criminal proceeding fundamentally unfair the petitioner is entitled to relief. Fundamental fairness is violated when the evidence excluded is 'material in the sense of a crucial, critical, highly significant factor.'") (citations omitted).

The exclusion of the evidence concerning Dr. Wood's other cases and alleged misconduct did not render Ciambrone's trial fundamentally unfair.  Dr. Wood's other cases and misconduct occurred, if at all, in circumstances far removed from the autopsy of Lucas in this case.  The misconduct, if any, occurred two years after Dr. Wood conducted the autopsy of Lucas.  In one of the cases, Dr. Wood did not participate in the autopsy.  Even though Dr. Nelson reviewed Dr. Wood's report, he

also reviewed the photographs, the medical records, the notes, and the slides of Lucas's brain to come to his own opinion.  Trial counsel thoroughly cross-examined Dr. Nelson on more relevant grounds concerning his own opinion, including the adequacy of his review of those materials.  (Doc. 21-9 at 445–88)

For example, Dr. Nelson reviewed the brain slides and opined that Lucas died from brain damage caused by blunt force trauma.  Trial counsel confronted Dr. Nelson with the opinion of another doctor who reviewed the same slides but came to a different conclusion.  (Docs. 21-9 at 479–81)  Also, trial counsel challenged Dr. Nelson on his failure to personally participate in the autopsy and his reliance instead on Dr. Wood's report.  (Doc. 21-9 at 484)  Trial counsel raised both reasons to reject Dr. Nelson's opinion in closing argument and relied on other medical evidence to assert that Lucas died because he suffered from intestinal parasites, which caused him to choke on his own vomit.  (Doc. 21-10 at 361–64) Because the state court provided Ciambrone a "fair opportunity" to present more relevant evidence in support of her defense, the state court did not unreasonably apply clearly established federal law. *Taylor*, 760 F.3d at 1296–97.  *Demps v. Wainwright*, 805 F.2d 1426, 1430–31 (11th Cir. 1986).  Ground Four is denied.[3]

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

Ciambrone claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of

_____

[3] In her reply, Ciambone proffers evidence not presented to the state court in support of her claim. (Doc. 36 at 18–24) On federal habeas, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

ineffective assistance of counsel are few and far between." *Waters v. Thomas*,

46 F.3d 1506, 1511 (11th Cir. 1995) (quoting *Rogers v. Zant*, 13 F.3d 384, 386

(11th Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains

that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of

counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing
> > that counsel made errors so serious that counsel
> > was not functioning as the "counsel" guaranteed
> > the defendant by the Sixth Amendment. Second,
> > the defendant must show that the deficient
> > performance prejudiced the defense. This
> > requires showing that counsel's errors were so
> > serious as to deprive the defendant of a fair trial,
> > a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . .

to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an

actual ineffectiveness claim must judge the reasonableness of counsel's challenged

conduct on the facts of the particular case, viewed as of the time of counsel's

conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Ciambrone must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, Ciambrone must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Ciambrone cannot meet her burden by showing that the avenue chosen by counsel proved unsuccessful.  *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).  *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105.  *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is

found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In denying Ciambrone's Rule 3.850 motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of counsel. (Doc. 21-15 at 145)  Because the state court rejected the grounds based on *Strickland*, Ciambrone cannot meet the "contrary to" test in Section 2254(d)(1).  Ciambrone instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.  In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001).  The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A.  Ground of IAC Before and During Trial

### Ground Five:

Ciambrone asserts that trial counsel was ineffective for advising the trial court that he was ready for trial even though he was unprepared ("sub-claim A"), for objecting to the prosecution's motion for a continuance even though he was unprepared ("sub-claim B"), for not moving to preclude the prosecution from presenting a theory of guilt inconsistent with the theory presented in her co-defendant's trial ("sub-claim C"), for not timely moving to disqualify the trial

judge ("sub-claim D"), for not presenting testimony by Dr. Frank G. Mullens, Jr.,

a child psychologist, at trial ("sub-claim E"), and for not presenting additional

witnesses at trial who would have supported her defense. ("sub-claim F")

(Doc. 1 at 10–27)

### Sub-claim A and Sub-claim B

In sub-claim A Ciambrone asserts that trial counsel was ineffective for

advising the trial judge that he was prepared for trial even though he was

unprepared.  (Doc. 1 at 11–15)  In sub-claim B Ciambrone asserts that trial counsel

was ineffective for objecting to the prosecution's motion for a continuance even

though trial counsel was unprepared.  (Doc. 1 at 15)  The post-conviction court

denied both claims as follows (Doc. 21-15 at 146–48) (state court record citations

omitted):

> Due to their interrelation, the Court addresses Defendant's
> claims in [both grounds] in combination. In [the first ground],
> Defendant alleges her trial counsel's performance was deficient
> when he asserted to the Court in January of 2007 that he would
> be ready for trial on March 26, 2007. As noted by the parties in
> their written arguments, the trial judge later denied counsel's
> subsequent motion for continuance, at least in part, because of
> counsel's statement of preparedness. The primary basis for
> defense counsel filing a motion for continuance on April 5,
> 2007 was his recent involvement in the three-day sentencing
> phase of an unrelated month-long capital trial.
>
> In light of the evidence presented, Defendant's trial counsel's
> assurance that he was ready to proceed with Defendant's trial
> on the original March 26, 2007 trial date appears reasonable at
> the time it was made. Had the trial proceeded in March of
> 2007, as initially scheduled, counsel's representation in the
> unrelated capital case would not have had such a significant
> impact. In fact, counsel opposed the continuance that
> eventually caused his scheduling and preparedness quandary
> with the other capital case, which is inherently reasonable.

Further, counsel testified during the evidentiary hearing on the instant motion that he was able to review all 60 boxes of files related to Defendant's case before the March 2007 trial date, was familiar with the voluminous records left by previous trial counsel, and his decisions regarding witnesses to call and theory of defense did not change between the original March 26, 2007, trial date and the ultimate beginning of trial on May 7, 2007. Thus, the primary factor interfering with counsel's representation of Defendant was the trial judge's granting of the State's motion to continue, which counsel properly and reasonably opposed. In fact, although Defendant's trial counsel indicated in the Motion to Continue filed April 4, 2007, that the case was complex and the materials voluminous, he only indicated one report — that of the State's witness, Dr. Stephen Nelson — that he had been unable to review. Notably, at that time, neither the State nor Dr. Nelson had even provided such a report to Defendant's counsel.

Moreover, Defendant's trial counsel testified during the limited evidentiary hearing that one of the reasons he wanted Defendant's trial set fairly quickly in March 2007 was because he was concerned about Defendant's mental health deteriorating while she was awaiting trial at the jail. Defendant's trial counsel further testified that in May 2007, Defendant was upset that her trial had been continued and delayed past the original March 2007 trial date. In light of the foregoing, Defendant has failed to show that counsel's assertion of preparedness in January of 2007 was unreasonable or deficient. Rather, Defendant's counsel made reasonable strategic decisions to pursue a trial date in March of 2007. Similarly, the Court finds that Defendant's trial counsel did not render ineffective assistance in his preparation for trial even though his trial planning calendar for the year was thwarted by the trial court granting a continuance in this case until May 2007.

Defendant raises a similar issue in [the second ground], alleging that counsel was deficient for opposing the State's Motion for Continuance, filed March 22, 2007. As noted above, counsel had compelling and rational reasons for opposing this motion, namely avoiding the potential mental deterioration of his client — who had already spent several years in a State facility when she was declared incompetent to proceed — while she awaited trial in the county jail and a potential preparedness predicament due to his representation of another client in the unrelated capital case. Regardless, despite counsel's opposition, the trial judge granted the State's continuance. To the extent that

> counsel's opposition to the State's motion was a factor in the trial judge's denial of counsel's subsequent request for [a] continuance, for the reasons noted above, the Court finds Defendant's trial counsel's decision to oppose the State's motion was nonetheless reasonable and clearly not deficient.
>
> Furthermore, the Court's confidence in the outcome of Defendant's trial is not undermined by the claims raised in either [ground]. In other words, Defendant has not established the requisite *Strickland* prejudice under these grounds, and they will both be denied.

Before trial, Ciambrone pleaded guilty to second-degree murder and the trial court sentenced her to fifty-five years in prison. (Doc. 21-4 at 176–80) Ciambrone moved for post-conviction relief under Rule 3.850, Florida Rules of Criminal Procedure, and asserted that trial counsel's deficient performance caused her to involuntarily and unknowingly plead guilty. (Doc. 21-5 at 9–11) The state appellate court reversed the post-conviction court's order denying relief and directed the trial court to allow Ciambrone to withdraw her plea. (Doc. 21-7 at 9–14) On January 18, 2007, Ciambrone withdrew her guilty plea and the trial court set trial for March 26, 2007. (Docs. 21-7 at 18–20 and 21-8 at 34–40) Ciambrone contends that trial counsel deficiently performed by announcing at the hearing on January 18, 2007 that he was prepared to proceed to trial in March.

Before the trial date in March, the prosecutor moved for a continuance because of the unavailability of witnesses, and trial counsel objected and told the judge that he was prepared for trial. (Doc. 21-15 at 162, 194) At the hearing, trial counsel provided the following reasons for his objection (Doc. 21-15 at 420):

> [Trial counsel:]      . . . Your Honor, I urge the Court to deny the State's motion. Basically, what it

comes down to is problems that they're having with two witnesses.

Doctor Kline-Fath that Mr. Lee is referring to was a radiologist from All Children's Hospital. In my opinion, at best she's a peripheral witness. Yes, she did testify at the trial of the co-defendant, but she never personally examined the decedent in this case. She merely interpreted some radiographic films. Quite frankly, any radiologist could interpret the radiographic films and there are at least three other radiologists who did examine the films in this case; two from Manatee Memorial Hospital and one from All Children's Hospital.

Mr. Lee says that there's no alternative to her appearance. Judge, I'm having witness challenges, as well. One alternative is video teleconferencing. I was going to ask the Court this morning to sign an order authorizing video teleconferencing for one of my doctors who is unable to personally appear in court. So I do believe that that witness is not essential to the State's case and that other arrangements could be made to deal with the issues Mr. Lee raises.

Judge, as far as Doctor Nelson is concerned, I'm really not quite sure why they went to Doctor Nelson in the first place. Our medical examiner for this district is Doctor Russell Vega. I've worked with Doctor Vega extensively over the last few years. I've got a lot of confidence in Doctor Vega. And quite frankly, I'm sure that if they went to Doctor Vega even today, that he would do all the necessary work to be ready for this case next week.

So I'm sorry that Doctor Nelson has been uncooperative. Quite frankly, I've dealt with Doctor Nelson in the past; he's

> frequently uncooperative in our cases. But I really have a hard time with that issue.
>
> Judge, I want you to know that I've got five doctors who are under subpoena and who have cleared their calendars to come in here next week. We sent our jury questionnaires to all these jurors that we've been busy going through. Ms. Ciambrone has been in the Manatee County jail since January, and I told you all when we came in here in January that I was prepared to do everything I could to get this case to trial because I was concerned about her being there.
>
> And then on a personal note, I've set up my whole trial schedule for the remainder of the year based around going to trial next week on this case.
>
> Judge, the State of Florida has got abundant resources. They have challenges, but I'm sure they can overcome those challenges. And I ask the Court to deny the motion.

During the hearing, trial counsel advised the trial judge that he represented a defendant charged with capital crimes whose three-week trial would begin on April 16, 2007. (Doc. 21-16 at 19)  The trial court granted the prosecutor's motion and continued the trial until May 7, 2007. (Docs. 21-15 at 162 and 21-16 at 103)

Before the trial date in May, trial counsel moved for a continuance because the capital trial was scheduled to begin on April 16, 2007 and conclude on May 3 or May 4. (Doc. 21-15 at 162)  Also, the prosecution had not disclosed a report from the medical examiner who would testify concerning Lucas's cause of death in Ciambrone's case. (Doc. 21-15 at 162–63)  In his motion, trial counsel represented that he spoke with Ciambrone who agreed with the request for a continuance in her

case.  (Doc. 21-15 at 163)  The trial court denied the motion and found that "counsel for the Defendant has indicated on [a] prior occasion his readiness for trial and, in fact, originally requested a March 2007 trial date."  (Doc. 21-15 at 160)

At the post-conviction evidentiary hearing, trial counsel testified that his supervisor assigned Ciambrone's case in December 2006 or January 2007 after the predecessor assistant public defender died.  (Doc. 21-15 at 168)  Another assistant public defender and two investigators worked with trial counsel on the case. (Doc. 21-15 at 169, 193)  The predecessor assistant public defender had deposed most of the witnesses and gathered relevant records kept in over 60 boxes. (Doc. 21-15 at 168–69)  Trial counsel and his co-counsel reviewed the documents in the boxes and prepared to call witnesses on behalf of the defense before the March trial date.  (Doc. 21-15 at 191, 193, 197–99)  Trial counsel moved for the continuance in March 2007 because his trial in the capital case interfered with his representation of Ciambrone.  (Doc. 21-15 at 171)  Trial counsel initially wanted to proceed to trial quickly because Ciambrone's mental deterioration in jail concerned him. (Doc. 21-15 at 186)  Ciambrone told trial counsel that she wanted to proceed to trial as soon as possible because she did not want to spend time in jail.  (Doc. 21-15 at 186–87)  Based on his review of the records, trial counsel concluded that the predecessor assistant public defender had thoroughly investigated and prepared the case for trial.  (Doc. 21-15 at 188)

Because the state court record shows that trial counsel was prepared to proceed to trial in March 2007 and moved for a continuance in May 2007 because

the other capital trial interfered, the state court did not unreasonably deny the claim.

Sub-claim A and sub-claim B are denied.

### Sub-claim C

Ciambrone asserts that trial counsel was ineffective for not moving to prohibit the prosecution from presenting a theory of guilt inconsistent with the theory presented in her co-defendant's trial.  (Doc. 1 at 15–16)  The post-conviction court denied the claim as follows (Doc. 21-15 at 148–49) (state court record citations omitted):

> . . . Defendant alleges that her trial counsel was deficient for failing to object to the State's assertion of a theory of guilt in her case that was inconsistent with the theory of guilt argued in her co-defendant husband Joseph Ciambrone's case. The alleged inconsistency involves the State's position in each trial as to the factual cause of Lucas Ciambrone's death.
>
> In its opinion remanding this matter for further proceedings, the Second District Court observed that "Joseph Ciambrone's 1997 trial transcript does not appear to have been properly made part of the official court record in Heather Ciambrone's case." *Ciambrone v. State*, 128 So. 3d 227, 232 (Fla. 2d DCA 2013). Thus, Defendant was given the opportunity to present evidence to substantiate her claims, but failed to properly offer evidence of a direct inconsistency between the theories offered in her case and those of her co-defendant. Indeed, although Defendant's post-conviction counsel attached two pages of the State's closing argument in Joseph Ciambrone's 1997 trial to Defendant's written closing argument submitted following the conclusion of the evidentiary hearing in this matter, Defendant did not follow the proper procedure for offering evidence of the State's theory in her co-defendant's case. *See Marek v. State*, 8 So. 3d 1123, 1128 (Fla. 2009) (rejecting a defendant's post-conviction claims of ineffective assistance of counsel based on his failure to demonstrate inconsistent theories or follow the procedures outlined in *Johnson v. State*, 660 So. 2d 648 (Fla. 1995)). "At an evidentiary hearing, the defendant shall have the burden of presenting evidence and the burden of proof in support of his . . . motion, unless otherwise provided by

law." Fla. R. Crim. P. 3.850(f)(8)(B). Defendant failed to meet her burden here.

Further, although the Court does not base its decision on the record of the co-defendant's case, a cursory review of Exhibit JJ to Defendant's written closing argument suggests that even if the transcript of her co-defendant's trial was properly placed before this Court, it would only serve to undermine Defendant's claims as to inconsistent theories of guilt. The Court, nonetheless, finds that absent Defendant's demonstration that the State's theory in her case was, in fact, inconsistent with its theory in her co-defendant's case, she has failed to demonstrate any prejudice resulting from counsel's failure to raise the issue. Accordingly, Defendant's claims in [this ground] are denied.

Whether Ciambrone properly presented to the post-conviction court the transcript excerpt from her co-defendant's trial is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. Because Ciambrone failed to prove the claim at the post-conviction evidentiary hearing, the state court reasonably applied *Strickland*. *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013) ("We have said . . . that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant.") (citation omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) ("*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.") (citation omitted).

Also, during the closing argument at the trial for Ciambrone's co-defendant, the prosecutor argued that either Ciambrone's or her husband's abuse of Lucas could have caused Lucas's death (Doc. 21-15 at 128–29):

[Prosecutor:]      Even if he had died accidentally that day on the floor of that bathroom, he died as a consequence of this conduct of

aggravated child abuse. And he may have struck that final blow to that child, he was there, the doctor said within that 12-hour period, he left for work shortly before 7 or shortly after, but it doesn't matter. It does not matter.

. . .

Whether or not he's at work doesn't matter. He's a principal. If it was Heather, it may not have been, it doesn't matter, his hand was on that child's body as well as hers at the time that he died that day.

But it is not the final blow that is the issue, ladies and gentleman, it is not the final blow. That may have taken his life, but he's charged with felony murder, and felony murder means that during the commission of the, as a consequence of this ongoing course of conduct of aggravated child abuse, a child dies. That is extremely important.

It was only a matter of time, as I said, that Lucas was going to die. Whether it was May the 11th or May the 12th, or June the 11th, it was only a matter of time. Because this aggravated child abuse that was going on in that house behind closed doors, by both of these Defendants, by this Defendant, by this Defendant, sooner or later that child was going to die. Whether it was by a blow to the head, whether it was accidental, it doesn't matter, the final inflicted blow is inconsequential. The final act where he died was a culmination of months of abuse. It was a culmination of that ongoing course of conduct; a culmination, a consequence of aggravated child abuse.

At Ciambrone's trial, the prosecutor argued that Ciambrone inflicted the abuse that caused Lucas's death.  (Doc. 21-10 at 341–49, 369–89)

Because the prosecution's theory at the co-defendant's trial was not directly inconsistent with the prosecution's theory at Ciambrone's trial, trial counsel's motion to prohibit the prosecution from the presenting the theory in Ciambrone's trial would not have succeeded and the state court did not unreasonably apply *Strickland*. *Pinkney v. Sec'y, Fla. Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."). *Drake v. Francis*, 727 F.2d 990, 994 (11th Cir. 1984) ("[T]he only inconsistent theory propounded in the two trials was that Campbell's prosecutor believed Campbell was the sole murderer while in Drake's case, the district attorney urged that, due to sheer physical necessity, Drake must have participated in the attack as well. Viewed in this light, the two theories are fairly consistent and there was no due process violation."); *Parker v. Singletary*, 974 F.2d 1562, 1578 (11th Cir. 1992) ("[N]o due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants. Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder."). Sub-claim C is denied.

### Sub-claim D

Ciambrone asserts that trial counsel was ineffective for not timely moving to disqualify the trial judge. (Doc. 1 at 16–17) The post-conviction court denied the claim as follows (Doc. 21-11 at 137–38):

> . . . Defendant asserts that her counsel was ineffective for failing to move to disqualify Judge Dunnigan from presiding at her

trial. Defendant alleges that she notified her counsel that Judge Dunnigan had granted the adoption of one of her sons and had also dealt with some of her children's dependency issues when she was first arrested. Defendant alleges that she was prejudiced by having Judge Dunnigan preside over her trial because, as a result of her bias, Judge Dunnigan denied all of Defendant's motions and granted all of the State's motions.

The Court finds that counsel was not deficient for failing to file a motion to disqualify, because there was no basis for such a motion. The test a trial court must use in determining whether a motion to disqualify is legally sufficient is whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial. *Chamberlain v. State*, 881 So. 2d 1087 (Fla. 2004). The motion to disqualify must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy. *Wright v. State*, 857 So. 2d 861 (Fla. 2003). "[T]he subjective fear of a party seeking the disqualification of a judge is not sufficient. The fear of judicial bias must be objectively reasonable." *Scott v. State*, 909 So. 2d 364, 368 (Fla. 5th DCA 2005).

In this case, Defendant alleges that her counsel should have filed a motion to disqualify Judge Dunnigan just because she had presided over previous proceedings involving Defendant. Defendant does not allege that Judge Dunnigan was in any way prejudicial toward her in any of those previous proceedings. To the contrary, Defendant acknowledges that the adoption proceeding was a very positive and celebratory event. Thus, Defendant has not alleged any objective facts that would support a successful motion to disqualify; instead, she merely expresses a subjective fear that Judge Dunnigan's prior involvement would create a bias. Therefore, a motion to disqualify would have been unsuccessful, and it cannot be said that defense counsel was deficient for failing to file an unsuccessful motion. *See Lugo v. State*, 2 So. 3d 1, 21 (Fla. 2008).

Whether a motion to disqualify would have succeeded is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. A party's "reasonabl[e] fear[ ] that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the

judge" justifies disqualification.  Fla. R. Jud. Admin. 2.330(e)(1).  "[A] judge is not disqualified from presiding over a criminal trial because the judge presided over civil proceedings involving the defendant, even where the civil proceedings arise out of the same incident as the criminal proceedings."  *Santisteban v. State*, 72 So. 3d 187, 194 (Fla. 4th DCA 2011).

At a pretrial hearing, the parties and the trial judge discussed disqualification as follows (Doc. 21-8 at 22–25):

| [Trial counsel:] | Yes, your Honor. The first question I had for the Court was, when we were in court on this case a week or two ago in front of Judge Gilner, Judge Gilner was under the impression that your Honor had recused herself from the case. And I have seen no record of that in Court View, but I thought you would know best whether you had or not. |
|---|---|
| [Court:] | I am not aware of any reason why I would. I believe that I have presided in this case over the years. |
| [Trial counsel:] | You have. |
| [Court:] | And I'm not aware of any reason why there should be a disqualification. I know that Judge Moreland, has, in fact, recused on her own motion based on I think some issues on appeal in that case. But the reason — no, I'm not aware of any. |
| [Prosecutor:] | That came up, Judge, because Mr. Quisenberry, who was on the case with Mr. Economou before I was ever on the case, had mentioned that to me, and said, hey, I think Judge Dunnigan, when I was on the case with Mr. Economou, had recused herself off the case. And I said, well — so I gave that information to Judge Gilner, and I never asked you, |

|  | obviously. And so you would know better than anybody. |
|---|---|
| [Court:] | No. I ruled on — I ruled on a similar or a collateral matter in juvenile court when it first arose. I believe that I ruled on a competency issue at some point during the time. I'm not aware presently of any reason why I would need to be disqualified. I'll leave that to you to investigat[e]. But to my knowledge, I have no reason to believe that I ever recused myself. |
| [Prosecutor:] | Were you involved at all in any of the proceedings with the children, dependency court or anything like that? |
| [Court:] | Only in the very beginning of the case, I believe I issued a ruling in the dependency court regarding opening of the files. |
|  | But subsequent to that, this case came to me from Judge Dubensky's division, and I believe that I ruled on competency at some point, so — |
| [Prosecutor:] | That would have been pretty close, then, to the time of trial. Do you think so? I mean, I can't remember, to be honest with you, interacting with your Honor. |
| [Court:] | No, I believe that — I haven't gone through the record, but my recollection is that the first determination of incompetency was made by Judge Smith a long time ago. |
| [Prosecutor:] | A long time ago, with Mr. Economou. |
| [Court:] | I believe that I had one or two competency hearings with Mrs. Ciambrone over the years. And I believe that the last hearing that I had was determining that at that time she was competent to proceed. And then I believe |

|  | I moved from the criminal bench to the civil bench, and I believe Judge Adams then — |
|---|---|
| [Prosecutor:] | But it ended up with Judge Logan, I know that, but anyways — |
| [Court:] | To my knowledge, there is nothing that I know of either of this case or — or the co-defendant's case that would disqualify me. |
| [Trial counsel:] | I just wanted to clear that up since we had that discussion at the last court appearance. |
| [Court:] | That's my full disclosure based on my recollection as of now. If during the course of the proceedings we determine other facts that refresh my recollection on it, I'll be happy to review it again at any time. |

Also, in her post-conviction motion, Ciambrone alleged that the trial judge

granted the adoption of her youngest son who testified at her trial.  (Doc. 21-11

at 77)  She described the adoption as a "memorable and monumental occasion,"

"celebratory in nature."  (Doc. 21-11 at 77)  She contended that (Doc. 21-11 at 77):

> The Defendant in no uncertain terms asked Counsel to
> file a motion to remove Judge Dunnigan, as the
> Defendant feared the Judge would be biased due to the
> fact that she had granted one of the adoptions of the
> Defendants' children and in retrospect was angry and
> embarrassed that she had done that; as well as the fact
> that she was one of the judges who presided over the
> Dependency/TPR case involving the victim's siblings
> and based entirely on the same set of allegations
> involved in the Defendant's criminal trial.

Because Ciambrone identified no facts that show an objectively reasonable

fear of judicial bias, the motion for disqualification would not have succeeded and

the state court did not unreasonably apply *Strickland*. *Pinkney*, 876 F.3d at 1297.

*Santisteban*, 72 So. 3d at 194 ("[T]he fear of judicial bias must be objectively

reasonable. The facts and reasons given for the disqualification must tend to show

personal bias or prejudice. The fact that the judge has made adverse rulings against

the defendant in the past is not an adequate ground for recusal, nor is the mere fact

that the judge has previously heard the evidence.") (citations omitted).  Sub-claim D

is denied.

### Sub-claim E

Ciambrone asserts that trial counsel was ineffective for not presenting

testimony by Dr. Frank G. Mullens, a child psychologist, at trial.  (Doc. 1 at 18–21)

The post-conviction court denied the claim as follows (Doc. 21-15 at 149–51) (state

court record citations omitted):

> . . . Defendant alleges that her trial counsel was deficient for
> failing to call Dr. Mullens to testify at trial. In its opinion
> remanding this matter, the Second District Court of Appeal
> found that the portions of the record attached to this Court's
> prior order did not refute Defendant's claims regarding the
> victim's behavioral problems before he was adopted. *Ciambrone
> v. State*, 128 So. 3d 227, 233 (Fla. 2d DCA 2013). The opinion
> also noted that the portions of the record attached to the order
> did not refute Defendant's claim that the victim's sister's
> "interpretation of events" was unreliable because she was not
> able to accurately comprehend the events when they occurred.
> *Id.*
>
> As an initial matter, Dr. Mullens indicated during his testimony
> on January 30, 2015, that he did not have an independent
> recollection of what took place during his meeting with the
> victim, nor did he recall testifying at co-defendant Joseph
> Ciambrone's trial. Dr. Mullens also testified that he observed
> no signs of emaciation, significant bodily injuries, eating
> disorders, or self-abuse. Dr. Mullens indicated that he had only
> spent an hour with the victim, and that the victim was very

cooperative until the last part of the session. Although
Dr. Mullens testified that the tests performed indicated that the
victim had anger and behavioral issues, the only behavioral
issue that he personally observed during the meeting was
a tendency towards distraction, which he admitted was not
uncommon for children of that age. Viewed in its totality,
Dr. Mullens's testimony would have been clearly inconsistent
with the defense theory that the victim suffered from these
issues prior to adoption by Defendant.

Further, Defendant's trial counsel called Dr. Jerome Isaac at
trial, who testified that prior to adoption, the victim had been
taken into foster care due to neglect, and had bruising on his
buttocks and scratches on his ear. James Baldwin, another
defense witness, testified regarding his day-to-day observations
of the victim's troubling behavior around February or March of
1992, shortly after Dr. Mullens examined the victim in January
1992. These episodes included extreme aggression and
self-abuse. As compared to the testimony of Dr. Mullens at the
evidentiary hearing, the witnesses called by Defendant's trial
counsel had more interaction with the victim [ ] around the
same time as Dr. Mullens, testified regarding the same
behavioral and emotional issues, and their testimony was
clearly more consistent with and favorable to the theory of
defense. Accordingly, Defendant has failed to overcome the
presumption — and the evidence presented supporting
a finding — that her trial counsel's decision not to call
Dr. Mullens was sound trial strategy. *See State v. Richardson*,
963 So. 2d 267 (Fla. 2d DCA 2007).

To the extent that Defendant's claims in [this ground] relate to
the victim's sister's interpretation of events, the Court again
notes that Defendant bears the burden of proof in support of her
claims at an evidentiary hearing. Fla. R. Crim. P.
3.850(f)(8)(B). *See Boisvert v. State*, 693 So. 2d 652 (Fla. 1997).
Defendant did not produce any evidence or testimony at the
evidentiary hearing substantiating her claim in [the ground] as
to the victim's sister's interpretation of events. Accordingly,
that claim is denied. *Id.*

At the post-conviction evidentiary hearing, Dr. Mullens, a clinical

psychologist, testified that he evaluated and tested Lucas before his adoption.

(Doc. 21-15 at 228–30)  Dr. Mullens described the four-year-old Lucas as "attentive

for most of the time, but he would get up from the test, walk around, do other things,

and then I would get him back to the testing situation." (Doc. 21-15

at 229)  Lucas cooperated well until the end of the hour-long test, when Lucas

became agitated.  (Doc. 21-15 at 229, 231)  Dr. Mullens explained that

a four-year-old would commonly display anger or frustration during testing.

(Doc. 21-15 at 235, 249–50)

       Dr. Mullens did not remember the interview with Lucas, and

post-conviction counsel instead introduced into evidence Dr. Mullens's report as

a recorded recollection.  (Doc. 21-15 at 232–33, 241)  Results from a Rorschach test

showed anger and aggressive behavior in Lucas's personality.  (Doc. 21-15

at 234–35)  Dr. Mullens observed no aggressive behavior during testing but learned

that Lucas had "turn[ed] on smaller children."  (Doc. 21-15 at 235)  Dr. Mullens

observed neither extreme emaciation nor injuries, including self-inflicted injuries, on

Lucas's body.  (Doc. 21-15 at 245, 249)  Dr. Mullens received no information that

Lucas suffered from an eating disorder.  (Doc. 21-15 at 246–47)  Dr. Mullens learned

that Lucas's birth parents abused Lucas before the adoption and opined that the

abuse could have caused Lucas's anger and aggressive behavior.  (Doc. 21-15 at 239)

Dr. Mullens further opined that that Lucas's anger and aggressive behavior would

remain with him for some time and suggested that Lucas continue to participate in

intensive therapy.  (Doc. 21-15 at 237–38, 248)

       At trial, Dr. Jerome Isaac, a pediatrician and medical director of the Manatee

County's child protection team, testified for the defense.  (Doc. 21-15 at 261)  The

doctor testified that in 1991 he evaluated the three-year-old Lucas after Lucas entered

foster care because of neglect by his foster parents.  (Docs. 21-10 at 152 and 21-15 at 262, 265)  The doctor observed a three-inch bruise on Lucas's buttocks and four scratches behind Lucas's ear.  (Doc. 21-15 at 263)  The doctor observed no other signs of abuse.  (Doc. 21-15 at 263)

James Baldwin, a clinical social worker, testified for the defense.  (Doc. 21-15 at 268)  Baldwin treated Lucas during his civil commitment at a children's hospital. (Doc. 21-15 at 271)  Baldwin described Lucas as "very outgoing" but also "very, very aggressive."  (Doc. 21-15 at 273)  Baldwin observed that Lucas lacked any concept of personal boundaries, refused to comply with requests, and refused to follow rules. (Doc. 21-15 at 273)  Lucas acted aggressively toward staff at the hospital and other children.  (Doc. 21-15 at 273)  When Lucas became upset, Lucas threw himself on the floor, ran into a wall, banged his head on the wall, or picked at himself with a paperclip.  (Doc. 21-15 at 273–74)  Lucas ate chalk and feces, drank water from the toilet, and sometimes refused to eat.  (Doc. 21-15 at 275, 282)  Also, Lucas threatened to kill people "like [his] dad killed people," threatened to cut his foster brother and Ciambrone with a knife, and threatened to hurt or kill himself when he became upset.  (Doc. 21-15 at 277–78)

When Baldwin's treatment of Lucas concluded, Baldwin strongly recommended that Ciambrone and her husband continue counseling and treatment. (Doc. 21-15 at 279)  Baldwin suggested that Ciambrone and her husband secure Lucas's bedroom window at night to prevent Lucas from running away from home. (Doc. 21-15 at 281)  Also Baldwin suggested that Ciambrone and her husband lock

Lucas's bedroom door from the outside, secure knives and other dangerous items, and remove weapons from the home. (Doc. 21-15 at 281) Baldwin diagnosed Lucas with attachment disorder, oppositional defiant behavior, and post-traumatic stress disorder. (Doc. 21-15 at 280)

Dr. Mullens met with Lucas for one hour, could not remember the meeting, and denied observing Lucas act aggressively or injure himself. Around the same time, Baldwin treated Lucas over many weeks, remembered specific times when Lucas acted aggressively, and diagnosed Lucas with behavioral disorders. In closing argument, trial counsel relied on Baldwin's testimony to argue that Ciambrone sought professional treatment for Lucas's behavior before his death. (Doc. 21-10 at 358–61)

Because Baldwin provided more relevant and impactful testimony than Dr. Mullens based on specific observations of Lucas's aggressive behavior, trial counsel was not ineffective for failing to present testimony by Dr. Mullens and the state court did not unreasonably apply *Strickland*. *Allen v. Sec'y, Fla. Dep't Corrs.*, 611 F.3d 740, 759 (11th Cir. 2010) ("This Court has emphasized that '[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'") (citations omitted). *Reed v. Sec'y, Fla. Dep't Corrs.*, 767 F.3d 1252, 1263 (11th Cir. 2014) ("The state appellate court had still another wholly independent and reasonable basis for denying relief: Coleman's account, even if credited, would not have directly exculpated Reed.").

Also, at the post-conviction evidentiary hearing Ciambrone presented no testimony by Dr. Mullens in support of the claim concerning Lucas's sister. Consequently, the state court did not unreasonably deny that claim. *Wong*, 558 U.S. at 27; *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1366 (11th Cir. 2021). Sub-claim E is denied.

**Sub-claim F**

Ciambrone asserts that trial counsel was ineffective for not presenting trial testimony by twenty-seven witnesses. (Doc. 1 at 21–26) The post-conviction court denied the claim as follows:

### Eliza Anna Van Wie

Ms. Van Wie worked in the Life Management Unit at Manatee Memorial Hospital, worked with the victim when he was three or four years of age, and testified that the victim was withdrawn and depressed. Importantly, she recalled that the victim only had anger issues "sometimes," and she did not recall him acting aggressively towards others or needing to be restrained.

At trial, counsel called Mr. Joel Bellemare and Dr. Barbara Srur, both employees of the same hospital who worked with or observed the victim at around the same time as Ms. Van Wie. Mr. Bellemare testified that the victim was hyperactive with emotional and aggression issues, detailing his observations of the victim's behavior indicating as much. [Dr.] Srur offered similar testimony as to the victim's behavioral, anger, and aggression issues. Although Ms. Van Wie's testimony regarding the victim's withdrawn, depressed, or sad disposition during her observations is subject matter not brought before the jury at trial, the Court is not convinced that such testimony would bolster the defense's theory or undercut the State's argument. More importantly, her testimony about the victim's anger only flaring some of the time and his lack of aggression towards others would have actually served to weaken the defense argument that the victim was already deeply troubled at the time. Accordingly, the Court finds that Defendant has failed to establish she was prejudiced by her counsel's failure to call Ms. Van Wie and elicit her testimony at trial.

(Doc. 21-15 at 152–53)

At the post-conviction evidentiary hearing Van Wie, a psychiatric technician, testified that she worked with Lucas at a psychiatric hospital five days a week. (Doc. 21-15 at 322–24)  Van Wie described Lucas as "withdrawn," "sad," "crying," and "a little depressed."  (Doc. 21-15 at 324, 326)  Lucas became angry sometimes, but Van Wie did not remember observing Lucas harm himself, act aggressively toward other children, bite things or other people, or behave poorly.  (Doc. 21-15 at 324–26)  Medical records showed that Van Wie observed Lucas bite his own arm and act "hyper."  (Doc. 21-15 at 333, 336)  Van Wie remembered that Lucas liked to play and needed nurturing.  (Doc. 21-15 at 325)

At trial, Joel Bellemare, a psychiatric technician at the hospital where Van Wie worked, testified that he worked with Lucas "quite frequently."  (Doc. 21-15 at 339–40)  Bellemare described Lucas as a "very, very hyperactive child" with "a lot of emotional issues" and "a lot of aggression issues."  (Doc. 21-15 at 341)  Bellemare observed Lucas act aggressively toward other children requiring Bellemare to physically restrain Lucas.  (Doc. 21-15 at 342–43)  When Lucas became angry, Lucas bit himself.  (Doc. 21-15 at 343)  When Lucas's poor behavior escalated, Bellemare placed Lucas in a quiet room where Lucas would yell, scream, and bang his shoulder and body against the door.  (Doc. 21-15 at 343–44)

Dr. Barbara Srur, a psychiatrist at the hospital where Van Wie worked, testified that she treated Lucas.  (Doc. 21-15 at 347–48)  Medical records showed that Lucas came to the hospital for treatment because of increasingly violent behavior and

severe and frequent temper tantrums.  (Doc. 21-15 at 351)  Medical records showed that at the hospital Lucas threw toys and other items, hit hospital staff, experienced "mood swings, impulsivity, hyperactivity[,] and oppositionality," yelled and screamed, could not follow directions, attacked another child with a plastic knife, and bit and injured himself.  (Doc. 21-15 at 355–64)

During closing argument, trial counsel argued that Lucas's poor behavior from his mental illness explained his physical injuries.  (Doc. 21-10 at 356, 361, 365, 367) Because Van Wie had no recollection of Lucas harming himself, acting aggressively toward other children, biting things or other people, or behaving poorly, the state court did not unreasonably determine that Van Wie's testimony would have weakened the defense.  *Allen*, 611 F.3d at 740.  Also, because trial counsel presented testimony by both Bellemare and Dr. Srur who observed Lucas behave in that manner, the state court did not unreasonably conclude that Ciambrone demonstrated no prejudice under *Strickland*.  *Reed*, 767 F.3d at 1263.

### Julie Maness Curles

Ms. Curles, who worked as a nurse in the Life Management Unit, testified at the evidentiary hearing that the victim was overly affectionate and that she had to clean feces from under his fingernails. As discussed above, the jury heard testimony at trial from Dr. Isaac, Mr. Baldwin, Mr. Bellemare, and [Dr.] Srur related to the victim's behavioral issues, neglect, and health issues, and from the testimony given at the evidentiary hearing. Accordingly, the Court finds that Defendant's trial counsel was not ineffective for failing to call Ms. Curles for cumulative testimony. *See Whitfield v. State*, 923 So. 2d 375, 380 (Fla. 2005) (holding that the failure to call certain witnesses was not ineffective assistance because witnesses already presented similar evidence and "counsel is not required to present cumulative evidence"); *see also Valle v. State*, 705 So. 2d 1331, 1334–35 (Fla. 1997) (affirming trial court's summary denial of

> ineffective assistance claim based on allegation that trial
> counsel failed to present cumulative evidence).

(Doc. 21-15 at 153–54)

At the post-conviction evidentiary hearing Curles, a nurse at the children's hospital, testified that she treated Lucas and described him as "very friendly, sweet" and "withdrawn."  (Doc. 21-16 at 499)  Curles observed Lucas show affection toward her and other staff at the hospital by giving hugs and sitting on laps. (Doc. 21-16 at 499)  Also, she observed feces under Lucas's fingernails sometimes. (Doc. 21-16 at 500)

Baldwin, a clinical social worker at the hospital, testified at trial that he observed Lucas eat feces.  (Doc. 21-15 at 269, 273, 275)  Bellemare, a psychiatric technician at the hospital, testified that Lucas became fond of staff at the hospital and frequently showed affection by giving hugs.  (Doc. 21-15 at 344–45) Dr. Srur testified that medical notes showed that Lucas believed that a staff member was his mother.  (Doc. 21-15 at 359)  Because Carles's testimony was cumulative to testimony by these witnesses who testified at trial, the state court did not unreasonably deny the claim.  *United States v. Dimatteo*, 759 F.2d 831, 832 (11th Cir. 1985); *Adams v. Balkcom*, 688 F.2d 734, 741 (11th Cir. 1982).

### James Carroll

> Mr. Carroll, Defendant's half-brother, testified at the
> evidentiary hearing regarding the victim's hyperactive and
> self-destructive behavior, as well as Defendant's reaction to the
> behavior. In the opinion accompanying its Mandate, the
> Second District noted that while the proffered testimony raised
> in [this ground] may be cumulative, the witnesses actually
> called at trial on these issues "had limited or no contact with

the victim in the year or two preceding [the victim's] death,"
and none had contact with him prior to living with Defendant.
Mr. Carroll testified that he had occasion to observe the victim
on only four occasions, and the last of those occurred
somewhere around 1991 or 1992, approximately three years
before the victim's death, and [he] did not provide any
testimony regarding contact with the victim prior to living with
Defendant. Further, as a close relative of Defendant,
Mr. Carroll's testimony would have been subject to attack for
credibility and bias. The Court finds that his testimony "would
not have added substance to the defense or challenged the
State's case"[5] beyond the testimony actually heard at trial, and
Defendant was, therefore, not prejudiced by counsel's failure to
call him at trial.

> [5] *Ciambrone v. State*, 128 So. 3d 227, 234
> (Fla. 2d DCA 2013).

(Doc. 21-15 at 154)

At the post-conviction evidentiary hearing Carroll, Ciambrone's half-brother,

testified that he observed Ciambrone together with Lucas about four times in 1991

and 1992, three years before Lucas's death.  (Doc. 21-16 at 543, 551)  The first visit,

Carroll saw Ciambrone treat Lucas in a loving way.  (Doc. 21-16 at 544)  The second

visit, Carroll saw Lucas dripping water around the home because he had not

completely dried off after taking a bath.  (Doc. 21-16 at 544)  Ciambrone told Lucas

to go back into the bathroom and dry himself off, and Lucas started to misbehave.

(Doc. 21-16 at 544)  Ciambrone's husband intervened, smacked Lucas on the

buttocks, and told him to dry off in the bathroom.  (Doc. 21-16 at 544)  Lucas threw

a temper tantrum, rammed his back into a wall, bounced on the floor, and pulled out

hair and flesh from his head.  (Doc. 21-16 at 544–45, 548)  Ciambrone punished

Lucas by sending him to his room.  (Doc. 21-16 at 545)  Carroll told Ciambrone that

Lucas needed help.  (Doc. 21-16 at 545)  Ciambrone responded that she and her

husband asked several state agencies for help but "no one seemed to want to go through the help." (Doc. 21-16 at 546) Carroll thought Ciambrone and her husband "were doing the best they could," "[w]ith a difficult situation and difficult child." (Doc. 21-16 at 546)

During closing argument, trial counsel argued that Lucas's behavior, resulting from his mental illness, explained his physical injuries. (Doc. 21-10 at 356, 361, 365, 367) Because Carroll's observations during four visits three years before Lucas's death would not have explained Lucas's injuries at the time of his death, the state court did not unreasonably conclude that Ciambrone demonstrated no prejudice under *Strickland*. *Reed*, 767 F.3d at 1263. Also, Ciambrone told police that on the day of Lucas's death she had ordered Lucas to dry off after he took a bath, and Lucas refused, became agitated, and went back into the bathroom. (Doc. 21-9 at 285–86) Ciambrone showered and returned to find Lucas slumped over in the bathtub. (Doc. 21-9 at 285–86) Because Carroll testified that Ciambrone and her husband punished Lucas for not drying off after a bath, Carroll's testimony would have weakened Ciambrone's defense. Lastly, whether the prosecutor could have impeached Carroll for bias is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. Because Carroll could have held strong feelings for Ciambrone, a sibling, the prosecutor would have impeached Carroll for bias. § 90.608(2), Fla. Stat.

### Scott Williams

> . . . [T]he Court heard testimony of Defendant's cousin,
> Mr. Williams, at the evidentiary hearing. His testimony

detailed the victim's behavioral issues and self-abuse, as well as Defendant's reactions to such behavior. Although unsure of the specific time, Mr. Williams testified that he observed the victim somewhere in the window of two weeks to six months prior to his death. Notably, when asked how Defendant would respond to the victim's aggressive or violent behavior, Mr. Williams noted that Defendant would try to hold the victim and show affection, but he also explained that the victim's behavior reached a point "where you couldn't do that anymore." Mr. Williams also testified that he had seen Defendant try to engage the victim in a loving and affectionate way.

In its closing argument at trial, the State devoted only one sentence to Defendant's alleged hatred of the victim, and a review of the testimony offered at trial shows that any alleged hatred of the victim was not made a feature of the trial, but rather was discussed briefly by a single witness. Dr. Stephen Nelson, a chief medical examiner with the State of Florida, counted 203 injuries on the victim's body, including fractured ribs and blunt force trauma to the head. Based on these findings, Dr. Nelson concluded that the injuries — particularly to the victim's head — were so numerous and severe as to rule out any non-homicidal manner of death. *Id.* The State's case did not depend to any substantial degree on Defendant's hatred of the victim, and in light of Dr. Nelson's testimony based on forensic medical evidence, the Court finds that counsel's failure to call Mr. Williams to testify regarding Defendant's lack of hatred does not undermine the Court's confidence in the outcome of the trial.

(Doc. 21-15 at 155)

The post-conviction court unreasonably determined that (1) "In its closing argument at trial, the State devoted only one sentence to Defendant's alleged hatred of the victim . . . ." (Doc. 21-15 at 155), and that (2) "The State's case did not depend to any substantial degree on Defendant's hatred of the victim . . . ." (Doc. 21-15 at 155)  The indictment (Doc. 21-2 at 140) charged Ciambrone with first-degree felony murder and alleged that Lucas's death occurred while Ciambrone committed aggravated child abuse in violation of Section 827.03, Florida Statutes, which defines

aggravated child abuse as "one or more acts committed by a person who (a) commits aggravated battery on a child, (b) willfully tortures a child, (c) maliciously punishes a child, or (d) willfully and unlawfully cages a child." § 827.03(1), Fla. Stat. (1995). At trial, the court defined "maliciously" for the jury: "Maliciously means done with malice. Malice means done from ill will, hatred, spite, or an evil intent." (Doc. 21-10 at 410–11)

During closing argument, the prosecutor told the jury that, "[Ciambrone] said to her neighbor, I hate him; I hate him." (Doc. 21-10 at 336) The prosecutor twice defined "maliciously" (Doc. 21-10 at 343, 374) and argued that Ciambrone maliciously punished Lucas by locking him in the bathroom with no light for hours at a time. (Doc. 21-10 at 343–344) The prosecutor argued, "She had confined him for whatever reason, whether she just couldn't stand him anymore, and that's what Dugan says, or she couldn't put up with it anymore, or, as some witnesses said, maybe she just got to the point where she hated him because he wasn't reacting to her appropriately." (Doc. 21-10 at 376) After pointing out that Ciambrone also locked Lucas in his messy bedroom, the prosecutor argued, "[T]his was done for punishment. Excessive, cruel and unusual, and malicious punishment. That's what all this comes down to." (Doc. 21-10 at 382) The prosecutor concluded, "[T]he acts themselves show the maliciousness and the anger and the violence against that kid, which is consistent with what the other witnesses have said in the case." (Doc. 21-10 at 385)

The indictment charged felony murder arising from aggravated child abuse, aggravated child abuse includes malicious punishment, and malicious punishment means inflicting punishment with ill will, hatred, spite, or an evil intent.   The trial transcript clearly and convincingly rebuts the post-conviction court's determinations that the prosecutor "devoted only one sentence" to Ciambrone's hatred of Lucas in closing argument and the prosecution's case did not substantially depend on that hatred.   28 U.S.C. § 2254(e)(1).  *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) ("If [r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination.") (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotations omitted).

Because the post-conviction court unreasonably determined a fact, the district court owes no deference under Section 2254 to the state court's adjudication of the *Strickland* claim and reviews the claim *de novo*.  *Cooper v. Sec'y, Dep't Corrs.*, 646 F.3d 1328, 1352–53 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre–AEDPA *de novo* standard of review' to the habeas claim.") (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008)).

Under the less deferential standard of review, Ciambrone's claim is without merit.  "Complaints concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy . . . ."  *United*

*States v. Guerra*, 628 F.2d 410, 414 (5th Cir. 1980) (citing *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).

At the post-conviction evidentiary hearing Williams, Ciambrone's cousin, testified that he met Lucas in the early 1990s and described Lucas as "uncontrollable." (Doc. 21-16 at 529–30)  Williams described Lucas's behavior as "rage, fits, screaming, kicking, scratching, just unbelievable actions from a child." (Doc. 21-16 at 530)  Williams visited Ciambrone often and saw Lucas within six months of his death. (Doc. 21-16 at 535)  Williams saw Lucas harm himself by slamming his own head into the wall during fits that lasted minutes to hours. (Doc. 21-16 at 530–31)  Also, Williams saw Lucas harm Ciambrone and her husband by kicking, scratching, and biting them. (Doc. 21-16 at 533)  Williams saw Ciambrone try to show Lucas affection by holding him and "engag[ing] [him] in a loving way," but when his behavior worsened Ciambrone could no longer do so. (Doc. 21-16 at 532–33, 540)  Williams never observed Ciambrone abuse Lucas. (Doc. 21-16 at 533)

At trial, Sean Helmer, the property manager where Ciambrone lived, testified that he observed Lucas bang his head on a concrete floor and a door and grab his own ears and try to tear them from his head. (Doc. 21-10 at 219–20)  Another time, Helmer saw Lucas ram his head into an oak tree in Ciambrone's front yard. (Doc. 21-10 at 221)  Sherry Long, a neighbor, testified that she heard Lucas growl and throw himself against the front door of Ciambrone's home. (Doc. 21-10 at 223) Long observed bruises and bitemarks on Ciambrone's legs (Doc. 21-10 at 231) and

denied observing injuries on Lucas's face.  (Doc. 21-10 at 232–33)  Stacy Greene, a neighbor, testified that she heard Lucas scream at Ciambrone and use profanity while she spoke with Ciambrone on the telephone.  (Doc. 21-10 at 237)  Also, Greene observed bruises and a bite mark on Ciambrone (Doc. 21-10 at 237) and denied observing bruises on Lucas.  (Doc. 21-10 at 238)  Patty Keene-Freed, another neighbor, testified that she observed Ciambrone with a bruised kneecap and heard Lucas call Ciambrone a "MF-er" and threaten to kill her while she spoke with Ciambrone on the telephone.  (Doc. 21-10 at 244–45)  Keene-Freed never observed Ciambrone mistreat Lucas.  (Doc. 21-10 at 244)  Because Williams's testimony about Lucas's behavior was cumulative to testimony by these witnesses who testified at trial, Ciambrone fails to demonstrate prejudice under *Strickland*.  *Dimatteo*, 759 F.2d at 832; *Adams*, 688 F.2d at 741.

No witness at trial testified that Ciambrone tried to show Lucas affection by holding him in a loving way.  Yet, Williams admitted that, "[F]irst she would try to hold him and just show him love, but it got to the point where you couldn't do that." (Doc. 21-16 at 532)  Consequently, Williams's testimony did not tend to prove that Ciambrone showed Lucas affection around the time of his death.

Also, Section 827.03 defines aggravated child abuse as committing an aggravated battery on a child, willfully torturing a child, maliciously punishing a child, or willfully and unlawfully caging a child.  § 827.03(1), Fla. Stat. (1995).  In closing argument, the prosecutor argued that Ciambrone's commission of all four forms of aggravated abuse caused the death of Lucas.  (Doc. 21-10 at 338, 343–44,

348, 373, 375, 389)  "A person commits aggravated battery who, in committing

battery: Intentionally or knowingly causes great bodily harm, permanent disability,

or permanent disfigurement."  § 784.045(1)(a)(1), Fla. Stat. (1995).  The medical

examiner identified four separate areas of bleeding on Lucas's brain caused by

non-accidental blunt force trauma (Doc. 21-9 at 424–30) and opined that four blows

to Lucas's head immediately incapacitated him (Doc. 21-9 at 435–39) and caused his

death.  (Doc. 21-9 at 443)  A pediatrician opined that neither Lucas nor another child

could have inflicted the injuries to Lucas's head.  (Doc. 21-9 at 652–53, 655)

Ciambrone told police that her husband was not at home when she found Lucas

unresponsive in the bathroom.  (Doc. 21-9 at 286–87)  This unrebutted evidence

proved that Ciambrone committed an aggravated battery that caused Lucas's death.

Consequently, even if Williams had testified that Ciambrone showed Lucas

affection, Ciambrone cannot demonstrate under *Strickland* a reasonable probability

that the outcome at trial would have changed.  *Dill v. Allen*, 488 F.3d 1344, 1359

(11th Cir. 2007).

### Remaining Witnesses

. . . Defendant bears the burden of presenting prejudice
resulting from counsel's failure to call a particular witness.
*See State v. Hanania*, 715 So. 2d 984, 986 (Fla. 2d DCA 1998)
("There is no evidence in the record to establish what the
[witnesses'] testimony would have been."). Although
Defendant lists 28 witnesses in [this ground] that were not
called at trial, she only offered testimony of 4 of those 28
proposed witnesses during the evidentiary hearing. Thus, to the
extent that Defendant has failed to offer the alleged testimony
of 24 of those witnesses, Defendant has failed to show the
necessary prejudice.

(Doc. 21-15 at 152)

At the post-conviction hearing Ciambrone presented testimony by Julie Maness Curles, Scott Williams, James Carroll, and Eliza Anna Van Wie. (Doc. 21-16 at 359–73, 498–503, 529–53)  Because Ciambrone presented no testimony by the other witnesses listed in her Section 2254 petition (Doc. 1 at 22–25), the state court did not unreasonably deny the claim concerning those witnesses. *McKiver*, 991 F.3d at 1366 ("The only evidence before the state appellate court was McKiver's own conclusory testimony about what the witnesses would have said and whether they would have been available and willing to testify. This testimony is precisely the kind of evidence that we — and other courts — have held to be 'simply inadequate to undermine confidence in the outcome' of the proceeding.") (citation omitted).  Sub-claim F and Ground Five are denied.[4]

**Ground Six**

Ciambrone asserts that the cumulative effect of all constitutional errors deprived her of a fair trial.  (Doc. 1 at 27–28)  Because no series of errors exists to accumulate, the cumulative-error claim is meritless.  *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012).  Ground Six is denied.

---

[4] Ciambrone asserts that her post-conviction counsel's failure to secure the attendance of these witnesses at the post-conviction evidentiary hearing entitles her to a hearing in federal court. (Doc. 36 at 27–37) Because Ciambrone fails to demonstrate that the state court's ruling was unreasonable under Section 2254(d), she is not entitled to a hearing on federal habeas. *Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1295 (11th Cir. 2015).

## VI.  <u>CONCLUSION</u>

Ciambrone's application for the writ of habeas corpus (Doc. 1) is **DENIED**.

The clerk must enter a judgment against Ciambrone and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Ciambrone fails to demonstrate either a substantial showing of the

denial of a constitutional right or that reasonable jurists would debate either the

merits of the grounds or the procedural issues, a certificate of appealability and leave

to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*,

529 U.S. 473, 478 (2000).  Ciambrone must obtain permission from the court of

appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on November 29, 2021.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE